Our first case of the morning is actually three cases, and we've given lots of time to lots of attorneys, and we indicated, I believe, that counsel could decide who would go first. So whoever has decided to go first can come to the podium, please. Good morning, Your Honors. May it please the Court, my name is Lisa Freeland, and I'm here today on behalf of Michael Pendleton, the first case on the list. Your Honors, Michael Pendleton has satisfied the prima facie standards set forth in Section 2244, and this Court should, consistent with its gatekeeping function in such cases, authorize Mr. Pendleton's application to file a successive petition. Are you reserving rebuttal, excuse me? I'm sorry, Your Honor. Yes, I am. Two minutes for rebuttal. Thanks for the reminder. As this Court is aware, the standard under 2244 is a prima facie showing, and I want to start out just addressing that standard briefly because it is rather unusual for the Court to be having a whole briefing and argument under 2244, and I don't know that there have been that many occasions where the Court has expressly addressed that standard and its applicability in circumstances like this. The Court has recently, I guess in the last decade, discussed the meaning of prima facie showing in Goldbloom v. Clem, and there it said that it was a sufficient showing of possible merit to warrant fuller exploration. And the merit part of that sentence refers to the requirements of 2244B, which in this case is whether or not the cases were made retroactive by the Supreme Court. What about the comment from the Fourth Circuit in the Williams case that you can take a quick glance and look through to the merits to decide whether or not you've really got a constitutional issue in play? Does that have any effect here? Your Honor, I don't think that it does have effect here, and I actually think it flies in the face of the plain language of the statute. And by looking through behind to the merits and making a merits decision at this stage, it's really erecting a higher burden for the applicants than Congress decided to have at this stage in the proceedings. Assume the counterfactual with me, and maybe an easy way to do this is actually to have you jump ahead, and I know you're not representing Mr. Grant, but assume we were talking about the guidelines case and that it was clear on the fact, or clear on the law, I should say, that the guidelines were not mandatory. Just that that, you know, they even said right in them, not mandatory. And that your client coming up through that system, again, we're talking counterfactual here, was trying to make the pitch to us that Miller is retroactive and I was sentenced under a mandatory scheme. And it was clear it wasn't a mandatory scheme. Are you suggesting that we would have to go ahead and send that to the district court and say prime facie case has been shown, even though that's a legal matter, it was clear it had nothing to do with your client? Isn't that kind of looking through the merits to see if there's a... Well, I do think that the hypothetical that you presented in the situation in our case is slightly different. But let me go with you and suggest that under the plain language of the statute, all an applicant needs to do is raise a claim that relies on a new constitutional rule made retroactive by the Supreme Court. And so the only question for this court at this point is whether the applicant has raised a claim that relies on. And I suppose... Even if it were just clear on its face that it had nothing to do with the person? Well... You'd send it back to the district court to make the district court deal with it? If I believe under the clear language of the statute that, yes, that would be required. And let me give you... But how would it warrant further exploration if you've already looked at it and said, you know, it's apples and oranges, it doesn't fit? And I think that really in the guidelines case where you're looking at a sentence that was not mandatory and that's clear on the record before you, you may be able to say that the claim doesn't rely on a case that's made retroactive by the Supreme Court. Because in a very real sense, it's not... It doesn't flow from the case, so to speak. Because the case is about mandatory sentences and the claim doesn't flow from it. But in terms of the equitable reasons, because I think they're very important why the court should not at this stage make that type of decision. Number one, it would be unreviewable. If you stick by the plain language and dictate of the statute, which requires a gatekeeping function only, as I've described under the language, it would go back to the district court. And if it is as clear as you believe that it is, the district court would quickly reach that conclusion, deny relief, and then that claim could come back to this court even if it's just to preserve it for future review in the Supreme Court. But there are equitable concerns that I hope that this court will take into account if it is inclined to look beyond the statute to the merits, and that is that it would absolutely cut off review for any applicant seeking relief under Miller. Are you going to argue that the Supreme Court's address in Jackson is persuasive here on the retroactivity issue or one of your other comments? I mean, actually, Your Honor, I was. We didn't divide up the issues because we thought that you might have questions for all of us about the different issues. Well, I'm interested in the Jackson aspect of it. And actually, my real response is that I believe that Jackson is a prima facie showing. It establishes a prima facie showing. But you've argued that the fact that the Supreme Court decided Jackson means that this is retroactive to – That the Supreme Court made it retroactively applicable, yes. But really, the Supreme Court didn't address retroactivity. All it decided was that Jackson was like Miller in terms of the constitutional problem. And then it's sending it back to Arkansas for Arkansas to decide based on its own rules retroactivity. Isn't that correct? I mean, isn't that what happened also in Florida that it went back and they decided based upon the Witt case? So don't we have a situation where, you know, perhaps Teague really isn't controlling on the retroactivity of a state case? Well, I don't think so, Your Honor, for a couple of reasons. First of all, in sending the case back, the court was silent with respect to the state court treatment of retroactivity. They did not direct the state to address retroactivity under state law. And it did – But isn't that necessarily what happens? There's a whole host of factors that could depend. It could depend on whether there's robust retroactivity law in that circuit. It depends if the parties raise that and put that before the state court. But the real issue is that the application of Miller in Jackson's case was the vacating of the court of appeals opinion. It said we've reached this rule in the Miller case, and we are applying it to vacate the order of the court below. That's the application of Miller in Jackson. With respect to whether or not there was a retroactivity ruling – Let me hold you up there for just a minute. Yes, Judge Jordan. Following up a little bit on Judge Rendell's question, do we face a circumstance here where we should be waiting for the Pennsylvania Supreme Court? I mean, your client and Mr. Baines are both, as I understand it, awaiting a ruling in the Cunningham case from the Pennsylvania Supreme Court. Do we have any mootness concerns here or abstention concerns that we should be dealing with? Because what if we say something and the Supreme Court of Pennsylvania says something different? Doesn't that put us in a little bit of an awkward spot, speaking into the air, when what really is going to count is what the Pennsylvania Supreme Court says about the retroactivity of Miller? Well, no, Your Honor. I think that there are exhaustion concerns. Obviously, the petitioners are – you know, most of these cases throughout the state of Pennsylvania are held pending a decision. The state PCRA proceedings are held pending a decision in Cunningham. And so if this court were to agree with us and find that there is a prima facie showing and remand it to the district court or send this to the district court for adjudication in the first instance, the district court would not be able to reach the merits, likely, until exhaustion was complete, and those proceedings would be stayed. And, in fact, I represent probably about 60 petitioners in the district court right now that are seeking first relief under – you know, a first relief under a petition for writ of habeas corpus. And those proceedings are all stayed in the district court awaiting exhaustion. If they have to wait, I guess the question is if it's going to have to wait if it gets to the district court, why do you want us to make a ruling on prima facie applicability or retroactivity? Why shouldn't we all wait and see what the Supreme Court has to say in Pennsylvania? Well, I mean, obviously, the district court on the issue of retroactivity, which is the history before this court right now, would not be bound by a state court ruling on retroactivity. The reason that we're here now instead of at some later point is because of the one-year statute of limitation and the failure of the Pennsylvania Supreme Court. So there's a reason why we're here now. But if you're suggesting should we just stay these proceedings and await a ruling, if that's the question you're asking. I'm asking, right. I'm asking because when you say the district court wouldn't be bound, that's true. But since these people are on state post-conviction review, if the state Supreme Court says it's retroactive, then they get relief, right? So it doesn't really matter whether the district court thinks they should get relief or not on a 2254 application. They're going to get the relief from the state Supreme Court, and so the district court will have rendered an opinion which has no effect, correct? Well, yes, Your Honor, but that's why I'm saying that the district court would not proceed. I think the proper course would be for this court to decide this issue, for these cases to be lodged in the district court, and most likely for them to be stayed in the district court, not in this court at this time. Yeah, but what I'm trying to ask you is if our sending it to the district court is only for the district court to wait because it makes sense to wait for the Supreme Court, why do we send it to the district court? Why isn't it right for all the federal judiciary to say, okay, this is in front of the state Supreme Court right now. They're going to have the last word on it since this is state post-conviction relief these guys have been in the process of. And, I mean, I'm not saying it's right or wrong. I'm just trying to pull your views. I mean, I'm almost right there with you. I mean, I see the argument why proceed now if it's just going to wait, and really the only answer that I can provide to you is that's the ordinary course of things. We wait. When state courts are deciding issues, we wait. We say petitions in federal court. I can't really, and I'm not trying to be difficult, and I see my light is on. I'll finish this answer, and unless there are any other questions, I'll sit down and wait for my rebuttal. But I'm not trying to be argumentative. I just think that whether it waits in this court or waits in the district court is not really that significant of a difference from my perspective. I understand from your perspective you have to make a ruling, and so it may be from yours. But on the prima facie standard, which I hope my colleagues will have an opportunity to address more fully, I believe we meet that standard and that it should be an easy decision for this court to make that decision, send these cases back to the district court, where they will likely await what will be the first word on retroactivity from the state court, but certainly not the last. Your point is that the state supreme court ruling wouldn't affect our prima facie. It would not, Your Honor. It would not. It would not.  Thank you. Thank you. Thank you. Good morning, Your Honors, and may it please the court. My name is David Fine. I represent Franklin X. Baines and other of the applicants in these cases. Your Honor, if I could reserve just two minutes for rebuttal. Are you going to argue substantive or procedural or both? I'm going to argue substantive, Your Honor, and I'm happy to get right to that if you'd like me to. I was going to try to address very briefly, if I might, Judge Jordan's last question of Ms. Freeland. You all definitely want us to decide this. Actually, you might be a little surprised, Judge Randolph. The only thing about what Judge Jordan says with which I would take issue is the suggestion that what the Pennsylvania Supreme Court does is the last word, because it really isn't. It's only the last word if it moots out these federal proceedings by deciding that under Pennsylvania retroactivity principles, Miller is retroactive, in which case perhaps our clients could get relief then through the state courts, which is, I think, Your Honor's point. If the court says no, it's not retroactive under state principles, we know under Danforth that that's not the end of the inquiry then because this court would decide under T. Sure. But the question that I put in and I think I hear you answering is, since there is that prospect that it could make anything we say irrelevant, perhaps we should be thinking about whether we've got a mootness or an abstention issue here, or do you disagree with that? I don't think, Your Honor, right now you can consider mootness or abstention. I think what you could decide right now is to push the pause button until the Pennsylvania Supreme Court decides Cunningham, and then once that court does that, for example, you could direct us to brief the case further, these cases, these consolidated cases, to address the effect of that. Hold its GAV and wait what happens? Yes. I don't think you could tell now whether there's a reason for abstention because I think, in fact, quite clearly there is no basis for abstention. Similarly, I don't think that you could address mootness now because the event that you're positing might cause mootness hasn't happened yet. So the most I think this court could do is say it. I'm sorry, Judge Randolph. Well, the thing is we know everything there is to know about the issues. I mean, the Pennsylvania Supreme Court, whatever it says, is not going to inform our determination of prima facie case. I think it will not inform it, but I think Judge Jordan's point, and I don't mean to presume... I'm sorry, you can help us talk to each other. Okay. What he's trying to say to you, I think what Judge Jordan's point is you might not even have to make the determination at all, not that it will be informed by Cunningham or anything else that the state court does, but that it might moot out the need for this panel to decide it. But if I could, let me move on to the issue of assuming that the court goes ahead and decides it, which I think at some point it may very well unless Cunningham comes down in favor of retroactivity under the state rules. Judge Rendell, you asked me when I stood up whether I was going to argue about procedural or substantive, and I think that if you look at the Shuro decision, which I think is very important here, notwithstanding how it came out, what it describes here is that the effect of Miller was, in fact, substantive in two ways. What Miller did in the first instance, and take a look, for example, at the Pennsylvania sentencing scheme, we know that the sentencing scheme in place, certainly when my client was sentenced in the late 70s, said that juveniles were subject to the regular old sentencing that adults were. They weren't separated out, including, by the way, for the death penalty at the time, and that if you were convicted of murder, your sentence was a mandatory life in prison without possibility of parole. The effect of Miller on that statute is to narrow it, because what it says, well, it actually narrows and broadens, because what it does is with respect to the statute that makes mandatory life in prison, it now carved out juveniles, because we know that juveniles can no longer be treated as mandatory recipients. At the very most, there has to be a sentencing hearing with the individualized terminations. Which is a process. Yes, Your Honor. But the distinction here is that in the usual case where we point at something and say that it's procedural under key, say Ring against Arizona, there it's a question of, for example, in Ring, who makes the determination of certain facts, which is purely a procedural thing. There was no question there that those facts were going to have to be determined, that the process was going to be engaged in. But this is what the process has to be engaged in, that's an individualized sentencing. And Penry says that substantive involves, you know, regardless of procedure. That if you have a substantive situation, that it is regardless of procedure. But this is really wedded to the courts have to do something that they're currently not allowed to do. And, Judge Mendel, I think that that is the point. This is not tinkering with the procedure, which is what we see in the other cases that the Supreme Court has looked at and said, no, no, no, that's procedural. Ring, Apprendi, all of those cases. Those are dealing with you have a procedure in place, we're tinkering with it. The jury has to decide this as opposed to the court or whatever it might be. In this case, we're saying you have to have procedure in the first place. And what that does, in effect, is it changes two criminal statutes in Pennsylvania. One, it carves juveniles out of the mandatory sentencing scheme. And the second is, it increases for juveniles the range of potential sentencing outcomes. But the Supreme Court in Miller seemed to be at pains to say, we're not saying you can't sentence these juveniles to life imprisonment without parole. You can do that. You just have to take some extra steps. So when you say take some extra steps, aren't you saying there's a procedural issue here? No, because they're not taking issue with the procedure. They're taking issue with the lack of procedure. And a mandatory sentence, and we developed this somewhat in our brief here. Hold on a second, because that's a nice turn of phrase, but it's still about procedure. And what you need to help us, or at least you need to help me with, is that language in Miller that speaks in terms of, you know, the retroactivity cases, they seem to talk about, Teague talks about something that takes it categorically and removes people from a particular criminal consequence. And here the Supreme Court has not done that.  Of course, that's divided the 11th Circuit. It's put some pretty strong arguments on both sides in front of us. How do we address that? How do we face the Supreme Court not removing mandatory life without parole from juveniles in homicide cases, only saying you have to take certain steps before you can do it? Your Honor, what I would offer by way of an answer is that, yes, the Supreme Court did, in language that you're referring to, say that it was not categorically banning all life sentences without possibility of parole. But what it did do was it did categorically bar a particular kind of punishment. That language was talking about one kind of punishment, which is any life sentence without possibility of parole, no matter what the procedure is. So you're saying that mandatory, and I think Justice Kagan probably did this somewhat, the harshness of mandatory makes the mandatory phrase jump out as compared to the life sentence without parole. It does, Your Honor. And let me focus on what you said, Judge Rendell, because a mandatory sentence, and we said this in our brief, and I think that it bears emphasis. And, Your Honor, may I go ahead and conclude? I see my red light is about to come on. That's all right. Go ahead. The issue here is that I think that we can all recognize that the reason that legislatures put in place mandatory sentencing schemes has nothing to do with the usual sorts of concerns that motivate procedural rules, accuracy, due process, fairness. Mandatory sentencing schemes, such as the ones that were in place in these cases, drug mandatory sentencing schemes, the whole host of them, are there because they are a particular form of punishment. They're there as a deterrent. It's not to have any accuracy. It's to say to people out in the community, if you do this offense, crack, you know, you trade and crack a certain weight, you will be sentenced to this amount no matter what. It's a punishment. Mandatory is the difference between procedural and substantive treatment. In this case, Your Honor, yeah, I think it is. I think it is the distinguishing feature from the language in Miller that Judge Jordan pointed to. Because mandatory, and it's the same way, Your Honor, with Woodson, which unfortunately never got a retroactivity determination. But Woodson, of course, was the case that said no mandatory death penalty. And we know that mandatory death penalty wasn't about accuracy or anything else that's procedural in nature. It was there to say if you commit A, B, or C offenses, that's it, you go to the death chamber. And that's more about punishment and deterrence. So those sorts of things. I'm sorry, Your Honor. But flipping around what you just said, the point of the Supreme Court's requirement for the individualized sentencing is accuracy. So what they required to be done and the rule they set down really is all about accuracy, isn't it? But it's not a change. Well, Your Honor, that part of it I think you're quite correct about. It is about accuracy. But what it's changing from and going to is makes it substantive. Because we're going from a form of punishment to only a form of punishment in certain circumstances. That narrows the criminal statute. And I'll reserve the rest of my time. I have no further time to reserve. I'm sorry, Judge Jordan. If my colleagues will indulge me, I'd like you to answer the question about the Jackson argument as well. If your argument about Jackson settling this case is correct, how is it that the Supreme Court in Chaydez, and I'm not sure I'm saying that case name right, which was a case on state post-conviction review, collateral review from the state process, could say that Padilla was not retroactive? In other words, Chaydez looks like the posture we're in here, people coming up from state post-conviction review. The Supreme Court has made a constitutional ruling in Padilla about the scope of Sixth Amendment rights. And they say in Chaydez, not retroactive. If it's an automatic rule the way you have argued it is, what are we to make of that? Your Honor, that's a difficult question because I think it raises some level of confusion about how the Supreme Court handles this. But I think that there's a response rooted in the posture of this matter before this court, which is that as Ms. Freeland said, the question that confronts this panel is whether there's a prima facie argument for it, something that should be developed more by the district court. And I would submit to you that certainly in, and I won't even try to pronounce the name of the case, but the case subsequent to Padilla that you've referred to, Your Honor, and that I know the government referred to in its brief in the Grant case, it did not say that secondary teak holding, we won't decide new questions of constitutional law, unless they would apply to cases on collateral review. It did not say that that did not make Padilla retroactive. It did a different retroactivity analysis. So I would submit to the court that there is at least a significant question about what the effect of those cases is. And that comes back to the point, Your Honor, about where we are. Please recall that under the statute, what this panel does on these applications is unreviewable, not even rehearing petitions, and probably final with regard to these gentlemen, or at least there's a good argument that I would imagine the government would make, which says that if later on some court decides, in fact, much more explicitly that Miller is retroactive, these fellows will be out of court. And that suggests that this court's gatekeeping role is, in fact, a very modest one. And that's the language from the Goldblum decision. If there's a colorable claim, if this is not a frivolous argument, and there's something that should be developed, you open up the gate, you let it go to the district court, where, by the way, that judge is not bound by whatever this court does. It's not a binding, it doesn't create law of the case. Goldblum says that. So whatever that court does then could come up before this court on appeal, rehearing, certiorari, all of the usual review mechanisms. But all of that suggests that the scheme that Congress created in the ADPA, in the section 2244, does not want you doing too close an analysis because, you know, to use the language. Especially after we've urged you that it's procedural. Well, there's that part, too. All right, we'll hear from you on rebuttal. Thank you, Your Honor. Thank you. Good morning, Your Honor. May it please the Court, David Glazer, appearing on behalf of Corey Grant. I also would like to reserve two minutes. You have a different situation here. I do, and I suspect we all can't punt on ours, right? Pardon me? I suspect we all can't punt, that is defer it to someone else. No. I think we're going to have to deal with Corey Grant. Yeah, the fact that it really wasn't a mandatory sentence that was imposed on him and his youth was considered, correct? Well, if I were to rely on Booker, I would say that it was mandatory, Judge, with all due respect. While the language of the guidelines pre-Booker were always that there is some opening, there is some discretion, I would argue respectfully to the Court that there really wasn't any. Part of what the government's position is in our case is that we pursued these arguments, that we had several bites of the apple already, and I would submit to the Court that there really was no apple back in 1992 when we appeared for sentencing. Well, what was the purpose then in making the arguments? Because as you've said, the arguments were made, and if I'm correct, you were counsel then and were commended by the District Court in the sentencing transcript. I'm delighted. Or the effectiveness of your presentation. I mean, the Court went out its way to say you've said it well, it's highly persuasive, but I'm not persuaded. At the end, I'm not persuaded. What more would we say to a District Court, you know? I'm delighted. We thought about it, but think about it again. I'm delighted you say that, because you're asking me kind of like, what were my motives of doing this if I felt that there was no possibility? If indeed it was mandatory and there was none, how can I argue now that I – what was I thinking when I argued for an hour and a half in sentencing? Yeah. Yeah. So you thought there was some discretion there, right? No, I did not. Frankly, I may have been hopeful, but the truth of the matter was, I had been through the case for over a year at that point. I had never had in – despite having considerable experience in criminal law, I had never had a juvenile waived up in federal court. The entire procedure that was done was new to everyone. When we appeared at the arraignment for Corey Grant and the other juvenile, Vincent Jackson, Judge Politon may rest in peace, had the statute book open to look about – to look into what were the procedures for a transfer to adult court. Nobody really was familiar with it. When I argued, when I argued for the period of time that I argued at the sentencing, I really felt the need at that time to put on the record, because we didn't have a hearing, because – for the waiver, that is, for the transfer. There was no hearing as such because all the government had to do was show we had two prior offenses and there's an allegation of violence, and it's automatic. You don't get a hearing. That's it. Ironically, the two prior offenses were two offenses that were part of the RICO, so they were not even new offenses. They were offenses from before. And that was part of my argument on appeal originally, that, you know, that this should have been – there should have been some safeguards for that as well. So the point that I'm attempting to make here is that when I argued for an hour and a half at that time, throughout the entire procedure, the fact that my client was 13 to 15 when most of these offenses allegedly occurred. He was one month into his 16th birthday for the homicide. Nowhere on the record, nowhere at any point in court does it ever come out that he was a juvenile. Well, let me just ask you. Well, I say that. I say that just because that's central to the Miller decision. You – let me quote you something from your brief. You say, in imposing – this is on page 22 – in imposing Mr. Grant's sentence, the district court did not meaningfully consider the significant gaps between juveniles and adults in various aspects of responsibility, et cetera. I read that, and I wondered, is that almost conceding that your complaint is you didn't like the way the court handled it, not that the court didn't have the opportunity to consider, but you just thought that the court didn't meaningfully consider it? Judge, I think it goes back to what you originally said to me. You know, the court did say, you know, that I'm considering this and I'm considering that. And with all due respect to Judge Ackerman, may he rest in peace, I'm the only survivor. You're making us nervous. I mean, isn't your point that the district court could not meaningfully consider? Absolutely. You know, the camel going through the – Sure, there was no amplitude. Just look at the policy statements and 5H. Just look at what it says. Age is not a factor. Socioeconomic is not a factor. But, you know, the – You weren't able to take it into account at all. Not at all. Absolutely. Nothing. Well, is that true? Under Shoup, couldn't you have done it? You could have under extraordinary circumstances, and you could have done it in the context of criminal history. That's what the Shoup case says. Sure, sure. So, you know, and this is part of – There's a possibility. It was little, but – Yeah, it wasn't – Well, little. The door wasn't open much. Little, much. Was it open enough to make a difference as a matter of law? No, it didn't make a difference as a matter of law, with all due respect, Judge. When counsel had responded to my brief back then, and I can quote from the brief of the government, that I can't cite a single case to support my argument. And they're saying the same thing today. I can't – Rather, I'm saying that. They can't – There were no cases, no juvenile, no juvenile, to my knowledge. Shoup didn't involve a juvenile. No juvenile ever got a downward departure. None. I mean, where was I going? I felt the need to put on the record, back in 1992 when I appeared before Judge Ackerman, to have a record of who this person was. You know, everybody – I'm sure out of the 2,500, there's 2,500 that they say in the pipeline, everybody probably believes they have to post a juvenile. They have to post a juvenile.  I mean, he was not the shooter. A 21-year-old was the shooter. In this indictment, in this indictment, the main – the centerpiece of the government's case was a Bilal Pratlow. And he committed suicide. On the merits of the case, I mean, I'm not sure I'd pin too much on that because the district court was at pains to point out that even though your fellow wasn't at the top, he certainly wasn't at the bottom. And the comment that I bet you wish Corey was out there on the street indicated that the members of the conspiracy had a lot of faith in the violent tendencies and the retributive tendencies of your client. So maybe he isn't the post-trial. But more to the point for what we're dealing with here today, all those things were put in front of the judge. The judge heard all those things. They talked with you about them, right? Well, they were put in by an attorney who felt the need that there should be on this record something for Corey Grant that isn't – something that pertains to him that nowhere on the record – because he was a juvenile, because he was different. You know, part of the indictment, the original indictment against Bilal Pratlow, which never comes out at trial, which I argued also before Judge Ackerman, is that Bilal Pratlow, this RICO conspiracy, part of it was that they used juveniles. They forced juveniles. Well, they purposefully used juveniles. Pardon me? They purposefully used juveniles. Absolutely. And he's named in two counts. Corey Grant is named as the victim in two counts of that indictment. In terms of Miller, I mean, if we read Miller as having to do with mandatory sentencing, you have a problem. But aren't you, in essence, asking us – and I throw this out because I want your opposing counsel to address it – aren't you really asking us to read Miller more broadly and where Miller says that mandatory is the exception, not the rule, and indeed in the future will probably not be given to that many juveniles in this community? And to the extent that that's what the opinion stands for, it is diametrically opposed to what happened in your case where the mandatory was the universe and the non-mandatory was the exception, if you will, not the rule. I would agree with that. I mean, that requires us to read Miller in a different way, to read it having a broader holding than just mandatory. Correct? I believe so, yes. All right. We will hear from you on rebuttal. Thank you. Thank you. Thank you. May it please the Court, Rasheem Pettit on behalf of the Commonwealth in the matter of N. Ray Michael Pendleton. Your Honors, I'd like to just start in with what I believe is the crucial imperative issue in this case, and that is that Miller, I believe, clearly set forth a new procedural rule. Isn't the prima facie case really what we're here to talk about? It is, Your Honors. And I understand the argument that we're here in a gatekeeping capacity, but you can't get past the gate, so to speak, without showing that Miller is to be applied or was made retroactive. Or there's possible merit. Possible merit to warrant a further exploration. Correct. And I believe that when you look at what the Supreme Court did in Miller and you look at their specific deliberate language, that it is very clear that they were announcing a procedural rule. They took mandatory right off the table. They said you can't do this, period. As a matter of the Eighth Amendment of the United States Constitution, you cannot mandatorily send a juvenile to prison. Now, that sure sounds substantive, doesn't it? It is taking a category of punishment and setting it aside forever on a constitutional basis. When you phrase it that way, I see an argument to be made. But when you look at their language, unlike Miller, the analysis is Roper and Atkins. And they distinguish themselves from Roper and Atkins. They specifically say this is not like Roper, this is not like Graham, this is not like Atkins. Well, then tell me this. What would they have to have said for you to agree that it is substantive? I'm sorry, could you repeat that? I said what would they have to have said in order for you to agree that it's substantive? I think if they had made a categorical ban on life without the possibility of parole. But they have made a categorical ban on mandatory. On mandatory. That's off the table. But that is where the process lies. I mean, the court stated this case mandates only that a sentence or follow a certain process considering an offender's use. That is the precise language, the precise definition under Teague analysis of what a procedural rule is. They went on to say our decision does not categorically bar a penalty for class of offenders or type of crime. Can you concede, and it sounded like you did a minute ago, that it's at least arguable that the mandatory character of the life sentence is part of the punitive piece of the sentence and that by sealing mandatory life sentences off, there's a substantive rule in place. That's at least, that's not a frivolous argument. But something being frivolous and being arguable are two different things. There's a good faith argument that can be made in that respect, is there not? But the punishment is life without the possibility of parole. Stick with me. Is there at least a plausible argument that can be made that that is part and parcel of the punishment, and if it is, that's a substantive rule? Ultimately, that may not be the right answer, but it's an argument that has plausibility that you can think about. You can noodle around in your head and work with and try to figure out whether it's right or not. Sure. Judge Jordan, I would say that's plausible, but I would also say that this Court has said that it is not enough for the appellant to say that they've made an arguable claim that a new rule is substantive. That it must dictate it. It's not enough to just say it's arguable. It must dictate it. Sure. At the end of the day, that's the standard that has to be met. But at the prima facie stage, we've said in Goldblum, it only has to deserve further thought and development. So if that's where we are, and you can see that, and I think you're well advised to think about whether you can really say, oh, that's just so crazy, and if they could think about it, I'm not sure where you go. Because if Goldblum says what it seems to say, they're over the prima facie threshold, are they not? I disagree. Because? I think because when you read Miller and you look at the analysis, and they took steps to say we are not like those other cases. We're not like Atkins. This is not a case of Roper, Simmons, of Atkins, Graham. I think that that takes away any – Except the thrust of the opinion when you read it is that children are different. Children are different. There shall be no mandatory. And obviously, if you follow procedures, district courts have discretion. Courts have discretion to sentence. You can't take life without possibility of parole away from – in the rare case. I think that's the other aspect. The fact that Justice Kagan and the court says this is – we predict that going forward, mandatory will be the exception. It will be rare. So while not closing the door, they're totally – and I know the range of options – it's not just the range of options have been expanded. It's giving an option for 98, 6% of the cases that was never there before. How can that not be substantive? Well, I think there's a couple responses to that. First, uncommon does not mean impossible, does not mean unconstitutional, obviously. But do think about the future with juveniles and courts considering life without possibility of parole for a juvenile. Yes, the Miller Court makes it clear that their position is children are different. And because of that, we're going to change the process in which they are sentenced. They are not – We're going to change the sentences? We're going to effectively change, as a practical matter, the sentences they receive. Yes, and I – there are different possibilities. There are different ranges, if you will, of what. But I think to say that that therefore makes it a substantive new rule is a mischaracterization of what the issue is and what the issues are under key and what makes the new rule substantive versus procedural. Because there's more possibilities, if you will, that in and of itself certainly does not make a new rule substantive. Any time you announce a new constitutional rule, there's going to be – I mean, I would argue there's going to be differences that happen and consequences of that. But not every new rule is applied retroactively, and the courts have been very, very clear on that. And if I – Can you answer the question about – which I put to Ms. Freeland – about whether we should be moving forward or not? I mean, you're representing the Commonwealth in a case where clearly the state Supreme Court is going to say something pretty significant probably pretty soon. Why should we be deciding this now? Well, as I – I did put that as my first matter in my brief is just the fact that he does have a timely PCRA – Mr. Pendleton has a timely PCRA pending in state court. I believe he filed it five days after the Miller decision came out, so he was on the ball. That case has been stayed pending Cunningham. This issue that he wants to raise in district court is I exhaust it. So I do think that that's another consideration and should factor into the decision here. And if I could, I'd just like to respond to the question that was posed about the Jackson case and how that, if at all, affects this issue. I'm running out of time. I would like to say that I think I agree with Judge Rendell here that what the Miller court did in remanding the case back down to state court, I do not think that that made a key decision for us. I think it's really counterintuitive to say that what happens in a case that was on state collateral review is going to determine how this court is going to decide a Teague issue. Well, hold up. The Supreme Court in Teague did not say this applies to federal cases or in any way limit that. The court's language was implicit in the retroactivity approach we adopted as the principle that habeas corpus cannot be used as a vehicle to create new constitutional rules of criminal procedure unless those rules would be applied retroactively to all defendants on collateral review. It didn't say all defendants on federal collateral review or all defendants except the ones on state collateral review. It said all defendants on collateral review. That's pretty broad language. Why would we insert a modifier? I believe that subsequent to Teague that the Supreme Court in Danforth versus Minnesota, I believe I have the case name correct. Yeah, but then they said the state can be more generous in its retroactivity. And they do use the words federal court, federal court a lot. But they don't say, it has never said there are different rules for, it's collateral review, it's not limited. It never said it's limited. We do certainly recognize that federal habeas collateral review is different from state, I mean, all the different states. I mean, there's obviously things that are cognizable under one, for example, in the Pennsylvania Peter A. But that doesn't speak to this question. The question is what does Teague mean when it says when we announce this rule and apply it, it's going to apply to everybody on collateral review? In an unmodified way, it says that. The fact that in Danforth they say if states want to go past that and be kinder and gentler to criminal defendants, fine by us. How does that speak to what Teague says? I think that it still is not, I don't believe that it would make the best sense to rely on that, what happened with Control Jackson, to then make a broad finding that it was meant to be collateral on federal habeas review. Because in order for that to be the case, it needs to be a substantive rule or a watershed rule. Thank you. Thank you. May it please the Court, Ronald Eisenberg for the Commonwealth in the Baines case. I'd like to pick up on a point that's been discussed to some degree so far, but I think deserves a little more attention, and that's the reference to the idea of Miller as changing the range of options available for sentencing. You heard something similar from my colleague, Mr. Fine, when he spoke about narrowing and broadening the sentence possible. You see it all over the Justice Department's brief when they speak about expanding the range of sentences and they say that Miller does that. And I totally acknowledge Miller does do that, and it does it in a large number of cases as Judge Vandell pointed out. The problem is that's not the test for retroactivity. If it were, we'd have some larger problems. Well, isn't it, first, just as enlightening, curious, have you ever found yourself in a situation where the United States and the VA's office are saying, hey, you know what, completely different things about whether a defendant gets the benefit of a retroactive rule? It is curious, Your Honor. Indeed it is. It gets curiouser when you play it out, when you play out the standard that the Department has advocated along with the defense, which is- Well, hold on. Let me ask you this. Should it matter to us that the United States of America, through the Department of Justice, has taken the position that it's taken? Does that have any weight? No, Your Honor, because the Department, I would suggest, doesn't seem to really mean it because it doesn't advocate- They don't get it. They don't mean it or they don't get it. The Department doesn't advocate the same standard in other situations. And I'll take you back just a few months ago to the week after Miller was decided, when the United States Supreme Court decided the case of Aileen v. United States, in which they held that mandatory minimums, as heretofore administered throughout the United States, were unconstitutional. Since that time, in that short time, there have been at least 28 district court decisions addressing the retroactivity of Aileen. Are you suggesting that because the Department of Justice doesn't believe that everything is retroactive, they can't believe that anything is retroactive? No, I'm not, Your Honor. What I'm saying is that in Aileen, the United States Supreme Court specifically and explicitly said that it is indisputable, that was their word, it is indisputable that mandatory minimums alter the range of prescribed sentences. Yeah, that was an interesting turn of phrase since they were changing their own minds, but go ahead. If that is the test, if that has now become the test, not just for the ruling in Aileen, but for retroactivity, then Aileen must be retroactive. Aileen automatically, by virtue of that decision in June, has become retroactive to all cases at all times in the United States. And yet, as far as I can tell from looking at those dozens of district court decisions, the government has not conceded the retroactivity of Aileen. So we can't believe these guys. Well, I think you have to question what they're saying. I think there's a reason that they're not conceding it there, and it's because the standard that they are espousing here today doesn't play out, doesn't work. And it's worse when you go beyond Aileen to Booker, because what Booker did was not to invalidate the sentencing guidelines, but merely, and the court was very clear about this, but merely to excise the mandatory aspect of the sentencing guidelines. And yet, the Department of Justice has not advocated for the retroactive application of Booker. In fact, no court of appeals has held that Booker is retroactive, including this one. It is indisputable, to use the court's word in Aileen, that Booker altered the range of sentences. It narrowed and broadened the sentencing options available to defendants in a huge way, in a dramatic way that could affect thousands of cases. And yet, Booker is not retroactive, and Aileen, as far as we know so far, is not retroactive. And the department agrees with me in those contexts, but the standard is what counts. That's not the standard for retroactivity. So what are we to make of decisions like out of the Eighth Circuit or commentary from some of the judges on the Eleventh Circuit that say it is the mandatory character of the sentence? That is a piece of the punishment itself. You heard Mr. Fine address that. What's erroneous about that logic? If that logic were correct, then it would raise retroactivity concerns in the Aileen and Booker context as well. As I've indicated, Your Honor, it was the mandatory…  The question that Judge Boren has put to several of your colleagues is there is a category of punishment that is now off the table. So a mandatory life without parole for a juvenile is now off the table. You've analogized this to Aileen and Booker. It's true that they changed ranges of punishment, but I don't see the analogy to this case, to Miller, where the Supreme Court took something off the table. They changed the range of punishment. By taking mandatory off the table, they changed the range of punishment. And it gets back, I think, Judge Jordan, to your comment during the argument of my opponent who said that this isn't a procedure, it's a lack of procedure. And your response, I thought, was correct, which is it's a procedure either way. I'm posing questions. I'm not taking positions. And my question to you is the same one that Judge Greenway has just put to you. Isn't there a distinction not just in degree but in kind when one says the guideline regime is going to have discretion now involved with it and saying here is a kind of punishment which you may not impose anymore? You may not impose a mandatory life sentence without parole on a juvenile period. No, Your Honor, because the question is still how you get to that punishment. For the guy who is serving life without parole, it's going to be the same punishment whether he got there by a mandatory sentence or a judge's exercise of discretion. And as we've just been discussing in the federal case here, the effect of the federal guidelines was, the defendant says, to make essentially mandatory that what Judge Rendell has noted as the key aspect of Miller would not be considered. It was mandatory that the court couldn't look at you. Can I ask you something that I put to your colleague for the Commonwealth? Doesn't the very fact that I have two sovereigns, competing sovereigns, telling me diametrically opposite things about the retroactivity of Miller mean that there's at least a prima facie case, an argument to be made for retroactivity? And if that's true, can we all just go home? No, Your Honor. I think it actually means exactly the opposite. How so? Because arguable is not the ultimate standard here. Possible merit. Possible merit. Deserving of further development. But possible merit of what? Possible merit of the retroactivity of Miller. And whether Miller is retroactive is a question that must be absolutely dictated at this time in order for the case to go forward. No, no, no. Not at this time. It's no different than any other look ahead at the merits of the claims as you were exploring earlier today. But it's potential merit. You're trying to draw a distinction between arguable and potential merit, and I don't speak for my colleagues. I'm not buying it. I'm sorry. If I sounded like I was trying to distinguish between arguable and potential, I'm not at all. I'm distinguishing between. Judge Rendell said in response to something you said, no, the standard is potential, right? And you had argued a moment earlier that, no, it's arguable. So you're attempting to draw a distinction between arguable as you posed it and potential merit as we see the standard for primarization. So tell us why potential merit isn't met here so that we can make the determination that it's primarization and to quote my colleague, go home. Because the primarization case has to be a standard, has to be applied to each element that's necessary for the defendant to go forward. And those elements differ. In this case, the crucial threshold element is the question of retroactivity, and that is a major roadblock for the defendant. And you cannot talk about the prima facie standard without considering the underlying standard for the claim that he will have to meet, and that's retroactivity. Isn't that what Goldblum says we're not supposed to do? Doesn't Goldblum say, in fact, on the underlying merit, whether the guy's going to win or not, don't think about that because that's not the question. The question is, is there a new rule of constitutional law made retroactive by the Supreme Court previously unavailable? Those are the things you're supposed to think about, and those are the only things you're supposed to think about. And if you're thinking about something else, you're wrong. Isn't that what Goldblum says? And I think that everything that we've been discussing today is whether there is a new rule made retroactive by the United States Supreme Court. And everything we've been discussing today is about how you determine now whether, in fact, that new rule has been made retroactive by the United States Supreme Court. And the way in which you... And the question I'm asking you is, isn't the question we're supposed to be asking, is there a prima facie case that it's retroactive? Not whether it is retroactive, but whether there's at least this potential merit deserving of further development. Yes, Your Honor. A prima facie case of whether it was made retroactive by the court, which means is there a prima facie case that the existing case law absolutely dictates that it is made retroactive. And you don't think it's significant in our thinking about that, that the people who you're sitting at the table with think there's at least prima facie merit. It's not insignificant, but since the government's own standard in this case is not applied by the government in other cases, I think that significantly weakens that possibility. The bottom line remains that the prima facie standard has to be applied to the underlying question of whether existing case law absolutely dictates. Gotcha. And as Judge Randell pointed out herself, the United States Supreme Court has been very clear about that, that in order for a rule to be substantive, it must be true regardless of any procedures followed. The punishment has to be off the table, says Penry, regardless of any procedures followed. And that is obviously not true. Well, mandatory is off the table regardless of any procedures followed. But mandatory is the way you get to the punishment, Your Honor, in the same way it was with the guidelines and with mandatory minimums. It's the way you get to the punishment. And they're obviously still away, and you've pointed out there won't be very many of those cases. And in the future, we predict, there might be none. Think about where we are now. The underlying standard is whether the existing case law absolutely dictates retroactivity, and yet that depends on a prediction about what will happen in the future, not even what's happened yet in the Supreme Court, but what the court might do in the future. But the word dictate, I mean, when the Supreme Court decides something, they don't tell you in their opinion whether it should be retroactive or not. I mean, that doesn't appear in Miller. But you need to look at the reasoning of the court. And, you know, there's a way of looking at the way Justice Kagan wrote it, and she uses the word process at one point. But the majority of the majority opinion is all about youth is different, youth is different, which is a substantive concept. And while the cases to date haven't dealt with this issue, I mean, obviously, every time it comes up with a new holding, there's going to have to be a consideration based upon the opinion of the court, not based upon what they've said in the past, because it's new. May I just touch on the point that you made about how the court doesn't always say whether it's retroactive? In this context, Your Honor, that's not completely true. And what I mean is that, as the court has observed in Beard v. Banks, a federal court must address Teague unless the state doesn't raise that question. It must, and that italics are in the United States Supreme Court's decision. In this case, the federal court didn't address Teague in Jackson and in Miller, and it's obvious from the papers that the state didn't raise that question. That's the only possible explanation for why the court didn't address Teague, because in Beard v. Banks, we are told that in order to make a retroactivity decision, the court must address Teague. That can't be so, or the rule in Tyler wouldn't make any sense. I mean, Tyler says you can develop this dictation for more than one case. I'm sorry, Your Honor. What that means is that you're applying the Teague analysis. The court doesn't necessarily say it's applying the Teague analysis, but the retroactivity has to fit the Teague analysis. And the one thing that Miller said most clearly about the language of retroactivity that looks like the language of retroactivity, that looks like all the cases discussing the standard before, was where it said that its decision doesn't categorically bar the penalty. It only establishes a process for it. It's the one place in the opinion where we have the clearest statement that might relate to retroactivity. I understand the defense as a victim. I don't think there's much other choice for them, but how ironic it is that on the one hand, the defense says Miller is a holding about retroactivity to say that it's retroactive under Teague, but only as long as we ignore the actual language in Miller that looks like it talks about retroactivity, that mirrors the standard for retroactivity. You can't be a holding in that one way and not in the other way. Thank you. Thank you. May it please the Court, I'm Stephen G. Sanders on behalf of the United States in the grant matter. I want to start, if I may, with point two of our brief and the exchange Judge Randall had with Mr. Glaser before he left, and that is, isn't he? I'd rather you didn't. You'd rather I didn't? Yeah. Why don't you start with rebutting the arguments of your colleagues at the table where you've been sitting? I'd be happy to, and that's why I'm here. The argument that the position we're taking is somehow inconsistent in the lien and the cases with mandatory minimums just doesn't apply because the test of the Supreme Court is whether you're eliminating a class of punishment for defendants based on their status, and nothing the Supreme Court did in the lien had to do with the status of the defendant. They just changed the procedure. They applied their Sixth Amendment holding and apprendi to mandatory minimums. So that range of punishment is still there. You can get a mandatory minimum. It just has to be the jury that makes a finding that triggers it, and that I think is sufficient to dispose of that part of Mr. Eisenberg's argument. Let me turn to the Tyler v. Cain argument because I think that's where this Court is. It has to be a combination of holdings, right, that dictate that this is a substantive law. And I think for all the reasons set forth in our brief, the opening up the range of punishment where you formerly had nothing but a mandatory life without parole, and now you have exposure to every possible sentence underneath that, that expansion of the range is a substantive holding. And it dictates, as Teague requires, the application to everybody else? What cases dictate that the expansion of the range is therefore substantive? I'd say Henry, one which describes what kind of rules are substantive. Yeah, that says regardless of process. Those words kind of flash out from Henry. And Safra also says that, right, that barring a type of punishment based on the status of the defendant, right, so that's case one, that's the category. And we say that the substantive component, because we realize that there's a procedural aspect of Miller as well, but the substantive component of Miller's holding, which says statutory, mandatory life without parole is off the table for all time for juveniles, that is a substantive holding. And it's those two cases, right? But what else other than Henry dictates? We were taking Justice O'Connor's words. We can look at a whole number of cases. So which ones dictate? I mean, Woodson might be in there. Although Woodson wasn't retro. It wasn't. And I'll turn to that because I think Woodson's an important situation because the Supreme Court could have addressed what it did in Miller in two separate steps, right? It could have said mandatory life without parole is off the table for all time for juveniles in case one. And in case two, it could have said, and going forward now in a different case, district courts or sentencing courts need to consider these specific mitigating factors as a procedural matter. If it proceeded in two steps like that, I think we would agree that that second case is procedural and it couldn't be applied retroactively in collateral review because those would be just like the death penalty cases that are cited in our brief and cited in the state's brief, right? Saying that the jury couldn't adequately consider a certain mitigating factor in a death penalty case is a new rule. But that's not what we have here. The Supreme Court actually did this in one fell swoop. It expanded the range and it said while we're doing that, sentencing courts going forward, you must consider these specific mitigating factors. Is the Jackson argument that's been made to us in the other cases carry weight? Do you think that it's correct to think in the terms that have been pressed on us by counsel for Mr. Spain and Pendleton that because Jackson was part of the same case holding in Miller that that's a proxy fatigue and we can say retroactive to state collateral review cases? No, I disagree with that. Because? Because state courts, right, there are statutes that allow judges to vacate conviction of state collateral review, allow them to vacate a conviction or sentence if it was imposed in violation of law. Now, it's a matter of state law whether they want to give the benefit of a federal rule of decision retroactively. They can say the rule in Miller was violated and we will give you the benefit of that rule. And if they do that, the federal rule of decision is still in place, right, whether there was a Miller violation. But if the state on collateral tax is willing to give a remedy, but it says that we don't think that there was any violation of the Eighth Amendment, that still raises an Eighth Amendment question for the Supreme Court. But the decision whether to grant a remedy is up to the states under their own state statutes. And that's what Danforth settled. I'm not sure I followed you there, so I apologize. Danforth, as I understand it, says states can be more generous. So it's conceivable that the state of Pennsylvania – well, I guess it's conceivable that the Florida Supreme Court could say, we're doing all these things for Mr. Jackson, even beyond what the Supreme Court said. But it certainly wasn't possible for them to say, well, forget what the U.S. Supreme Court said. It's not retroactive. I mean, did it set a floor? Obviously, I think if a new rule is retroactive on federal habeas, right, or substantive, then that ruling would be controlling on a state court. But I think we can – even if you disagree with me about the implications of Danforth, because we're talking about being more generous, right, it's not clear that the state – even if there were a habeas or fatigue objection that the state raised, or if it was Arkansas, I believe in the Jackson case. And so the case being remanded – Yeah, I'm sorry, it was Arkansas. Yeah, in light of Miller, it would just be up to the state then to decide, and I mean the prosecutors in that state, to decide whether they have a valid objection to the new rule being applied retroactively. And if they didn't waive that objection that was available to them, they waived it. Well, I guess the Supreme Court had to do something with Jackson once they took it. And vacating it doesn't necessarily mean they were imposing the Miller standard. I mean they had to affirm, reverse, or vacate, and they vacated to send it back to Arkansas for them to decide what to do, basically. That's right, and they vacated the judgment, not the sentence. And so – and I think this comes up – your Honor asked a question, Judge Jordan, about the pedia. Right, that pedia came to the Supreme Court on state habeas. It was a state collateral attack, and the decision of the courts below was that there was no violation of the – But the court – Chávez went out of its way in a footnote to say no Teague argument has been made to us. Footnote three has the Supreme Court saying they haven't even talked to us about Teague. We're here talking only about new rule. That's what Mr. Chávez put his whole pot – he was all in on that, and nobody has even mentioned Teague. So I assume that people can waive arguments and that the Supreme Court was just observing there was a waiver there, and they didn't need to raise it themselves. Should you read more into it than that? Right, that may be what happened, but even if it is, that may just be the simple explanation for what happened with the companion case with Miller, and that is it wasn't waived, and therefore there's no Teague implication of applying the Miller rule in the Judgment case. What about Miller's application to Grant, given the fact that it isn't mandatory, but the scheme under which he was sentenced kind of turns the thrust of Miller on its head in terms of what is – I mean, you talked about the range, well, the range of options. There wasn't a real bona fide range of option when he was sentenced to consider the aspects of use, was there? Well, there was, but let me – and this is what I wanted to pick up with what Mr. Glazer was saying to you. You asked him if he's really asking for an extension of Miller, right, and if he is. For a broad reading. Right, for a broader reading. But you see, if this case were up on direct review, Miller would clearly be important and it might be dispositive, but because it's on collateral attack, the petition has to show not only the right combination of holdings, but it has to show that its claim, under the words of the statute, relies on the new rule. And what he's really asking for here is an extension of Miller to say that the process that he got in his 1992 sentencing was insufficient. He has to concede that he got the opportunity, right, because there was no statutory mandatory minimum as was in play in Miller. But there was a mandatory guideline sentencing scheme, and it said don't think about age. There was a little carve-out, extraordinary circumstances. Maybe you can get away with it when you're looking at criminal history, but that was the smallest crack, just a little bit of daylight coming through there. For all practical purposes, was it not mandatory? It was not mandatory. I'm sorry, the presumption certainly was flipped. It was more than a presumption. You were told don't think about that, except in these really narrow carve-outs that the court made. Well, it was the policy statement of the guidelines that said age is not ordinarily relevant, and I think my time is up. May I continue? Please, thank you. I think there's a fair question, as Mr. Glazer said, whether the guidelines were even, whether the 5H1.1 policy was meant to apply to juveniles who were waived up and tried as adults. And so I think there could have been an argument that that policy statement didn't cover those sorts of defendants. But be that as it may, you still have the question. You can appreciate the irony he feels when the argument made to him back then was he can't point to a single case. And now you're here saying it's not really mandatory, and he can say you can't point to a single case. I mean, for all practical purposes, it sure kind of waddles and quacks like mandatory for the people who are facing it, right? I appreciate the irony. But I also have here a supplemental appendix with pages and pages of briefing and argument about youth and immaturity and its bearing on the offense. He had the opportunity to make it. He's just displeased with the consideration it got. He's displeased with the inability of Judge Ackerman to take it into account because the very narrow opening, if you will, of extraordinary circumstances wouldn't allow age to fit into the extraordinary circumstances. But Judge Ackerman didn't say that he was precluded from considering. If he had said that, that's a very nice argument. But what we know is the practical matter he was. I mean, we've been district court judges, and when you're not supposed to consider youth and you can only consider it in extraordinary circumstances, that's a very strong language for a district court judge. So he didn't have to say my hands are tied. They were. What would have been the guidance given the fact that there's no case law? You acknowledged there was no case law at the time. Well, I do. But, I mean, the fact that there could only be case law if such a departure was granted and the government appealed it and it was affirmed, it would be one situation. Isn't it extraordinary that at that point in 1992 the guidelines had been in for about five years, as I recall? I was an assistant when the guidelines came in. Isn't it extraordinary that there was no guidance at all at the time? I mean, what else would either Judge Ackerman or any other district judge think about whether they could fit the consideration of age into extraordinary circumstances other than not supposed to do it? Well, but if he thought that, he would have said that. He would have said that's a very nice argument, but I can't talk on that ground. Yeah. Some things that you actually think, quote, go without saying, unquote, and that you don't, you know, spit at the guidelines when they're effectively mandatory and you're told not to do stuff, I would have thought would sort of fit into that category. Well, we understand that reasonable people can disagree on whether Miller covers the situation. And, in fact, as my letter from yesterday showed, the Eighth Circuit apparently didn't think too fondly of the government's argument on that point about whether at the gateway stage this argument is going to fly, that it was imposed under a statute that allowed from zero to life imprisonment but was imposed under a mandatory guidelines regime. But I would like to conclude, if I may, by saying that at least on the question whether Miller applies to defendants who were sentenced to statutory mandatory minimum of life to juveniles, the government certainly stands by the position in its brief that there has been a prime official showing of retroactivity and that if this court, and in Grant's case, there's no reason to wait because it's this court or nothing for him. Right. Thank you very much. Thank you. Thank you. We have a rebuttal. Ms. Friend. Just a couple of quick points. Judge Rendell, you asked what's the line of cases that dictate my colleague from the Department of Justice, and I think the one that's missing is Shiro, which Mr. Klein spoke to earlier, that really it's post-Tegan. It extends the idea of a substantive ruling to something that narrows the class of punishment specifically that's available. And here, particularly in these Pennsylvania cases, we have a narrowing and an expanding. We have the reach of 1102. The Pennsylvania provision for life without parole is narrowed. It no longer can be applied to juveniles. And we also have, as many people have said, a complete expansion to the full ranges of punishments now available for juveniles. With respect to the argument and the word process that's used, I think, Judge Rendell, you've said repeatedly that you understand the full thrust of the decision, but I think that it's notable that the single most important sentence to my colleagues on the other side is really dictum in the opinion. The holding of Miller could not be clearer in some sense. It says, we therefore hold that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders. Answer, if you would, the assertion made by Mr. Eisenberg, that that that you want to dispose of and dismiss as dictum is, in fact, the language that most closely looks like language used by the Supreme Court when discussing retroactivity in other cases. I'm sorry, I didn't hear the end of your question. It most closely resembles the language used by the Supreme Court in discussing retroactivity in other cases. It goes out of its way to say, we're not saying you can't do this. We're only saying you've got to take certain steps to get there. Well, I would say that there's a reasonable reason for it within the context of this case. As the court said immediately following that language, we don't have to go here because we've got cases where the punishment was a mandatory life without parole. We'll save for another day that other category of sentences. But I don't think that you can use that language that seems to completely contrast, as you've recognized in some sense, with the absolute holding, which says mandatory is off the table. And you would have to believe that mandatory sentences are not a category of punishment, and that's just not really supportable in light of all of the other things that the Supreme Court said. And I want to respond to one other thing that Mr. Eisenberg said that I thought was very significant, is that one of the reasons why, and also Ms. Pettit, is that the court, he was talking about the Booker line of cases and that the government's position is contrary. But the Booker line of cases relied on cases that were not retroactive, and that's a big part of each of those retroactivity decisions here. We have a decision in Miller that relies on two lines of cases that are substantive, and that does speak to the rule in Miller as being substantive and sitting within, forget sitting within, being dictated by the line of cases that includes Shiro. I do see my time is up. If you would indulge me for one moment, because there's been a lot said about Miller and sua sponte and waiver and whether there was a Teague holding. And I think that it's very significant for this court to look at the cases from the Supreme Court. Judge Jordan, you mentioned the decision from Teague. The line that the Supreme Court has consistently drawn is between, with respect to new rules,  And whatever Danforth said, and I think the court recognizes the limitation of the holding in Danforth, the Supreme Court in Davis versus the United States returned to the direct appeal versus collateral line. And whenever a new rule is at issue, retroactivity is at issue, and whether it would be binding on the states is really not implicated here, because what we're talking about is whether the application of a new rule, a new rule of constitutional law to a case where a conviction is already final, what is the impact of that on a federal habeas case? That's the question here, not what the impact would be back in the state of Arkansas, but whether a Supreme Court decision that applies a new rule after finality is indeed retroactive. And I think everything in Supreme Court law says that it is. Thank you. All right, thank you. I'd like to bring the argument back to what I think Judge Rendell noted is perhaps the most important issue in the case. And Judge Jordan, you've examined it with counsel at some length, and Judge Greenaway, you have as well. And that's the posture of this case. The question under Section 2244 is not whether, as a legal matter, this panel agrees that the Tyler v. Cain standard has been met. The standard for present purposes is, is it arguable? Is there a case worth fleshing out in a context in which the district judge, one in the Western District, one in the Eastern District, and one in the District of New Jersey, can reach a determination fully? And that determination, as I said in my opening remarks, that determination will be subject again to review by this Court, a plenary review, the kind of review this Court ordinarily gives to the run-of-the-mind appeal, and then subject to rehearing petitions and obviously certiorari petitions. That's a vastly lower standard than what my colleague, Mr. Eisenberg, is urging on the Court. It's a quick-look standard to say, is there something there, to paraphrase Gertrude Stein, is there there there? And there is at least something worth examining. And the consequence of this Court reaching beyond that prima facie standard is tremendous. As I said, it's an unreviewable determination by this panel. But if this panel denies the applications that the various applicants, Mr. Baines, my client, Mr. Pendleton, and Mr. Grant, have proposed to the Court, have submitted to the Court, that's probably it for them. If there's an even clearer articulation in the future about Miller and retroactivity, they may be foreclosed from raising that before any Court. That means that the standard here should be a low one. It should be, is there something, to use the vernacular, to chew over? And this discussion among this panel and the determinations by the Second Circuit, the Fourth Circuit, the Eighth Circuit, and the United States Department of Justice, at least tell you that there is something worth chewing over, something that meets the prima facie burden. And I would ask that this Court grant the applications submitted so that these cases can proceed for determination in the District Court. Thank you. Upon reflection, I don't have anything to add, unless Your Honors have any questions. Thank you. Thank you. Thank you very much. Case is well argued. We'll take it under advisement.